# IN THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

24-2458
CRIMINAL

---

## UNITED STATES OF AMERICA,
Appellee,

v.

## BRADLEY EUGENE WENDT,
Appellant.

---

*APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF IOWA*
*HONORABLE STEPHEN H. LOCHER, U.S. DISTRICT COURT JUDGE*

---

## BRIEF OF APPELLEE

---

**Richard D. Westphal**
*United States Attorney*

**Kyle P. Hanson**
*Assistant United States Attorney*

Neal Smith Federal Building
210 Walnut Street, Suite 455
Des Moines, Iowa 50309
Tel:   (515) 473-9300

Attorneys for Appellee

## SUMMARY OF THE CASE

Wendt abused his position as police chief and lied to obtain machineguns for his personal use and enrichment. He now appeals his convictions for conspiracy to make false statements, nine counts of making false statements, and illegal possession of a machinegun.

The jury instructions fairly and adequately informed the jury how Wendt's false statements about "official use" and "possible future purchase" were material to ATF's decision-making process. And in any case, Wendt had no right to lie to the ATF in feigned compliance with ATF's machinegun-transfer requirements.

Next, Wendt shows no constitutional infirmity. Punishing his machinegun possession was not vague as applied to his conduct, and the Second Amendment does not protect dangerous and unusual weapons.

Finally, the sentencing court correctly applied a cross reference that more aptly punished his false statements under the firearms guideline.

Wendt's conviction and sentence should be affirmed.

## STATEMENT REGARDING ORAL ARGUMENT

This case has been screened for argument. Fifteen minutes per side would be adequate for a full discussion of the issues.

i

# TABLE OF CONTENTS

SUMMARY OF THE CASE ........................................................................i

STATEMENT REGARDING ORAL ARGUMENT ..................................i

TABLE OF CONTENTS .......................................................................ii

TABLE OF AUTHORITIES ................................................................iv

STATEMENT OF THE ISSUES ...........................................................1

STATEMENT OF THE CASE ..............................................................1

SUMMARY OF THE ARGUMENT .....................................................20

ARGUMENT ....................................................................................21

I.    The jury instructions fairly and adequately informed jurors about the materiality of Wendt's false statements.

    A.    Standard of review ...............................................................21

    B.    Argument..............................................................................22

        1.    Wendt's disagreements with ATF regulations did not excuse lying to the ATF.........................22

        2.    Instructions 16 and 24 correctly explained that transfers to a government agency are limited to "official use."............................................29

        3.    Instructions 17 and 24 correctly explained that transfers to dealers are limited to "possible future purchase" by a government agency...............................34

        4.    Wendt was not entitled to a *Harra* instruction...........38

        5.    Instruction 29 correctly limited machinegun possession to performance of official duties.................41

        6.    Any error was harmless.................................................49

Appellate Case: 24-2458    Page: 3    Date Filed: 12/02/2024    Entry ID: 5461769

II.   Wendt failed to prove that the law-enforcement exception was unconstitutionally vague as applied to his commercial use of city-registered machineguns.
    A.    Standard of review ................................................................ 52
    B.    Argument................................................................................ 52

III.  Machineguns remain dangerous and unusual weapons excluded from the protection under the Second Amendment.
    A.    Standard of review ................................................................ 57
    B.    Argument................................................................................ 57

IV.   The district court correctly applied a sentencing cross reference for the false-statement convictions because they were more aptly punished under the firearm guideline.
    A.    Standard of review ................................................................ 61
    B.    Argument................................................................................ 61

CONCLUSION ................................................................................ 67

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ........................ 68

CERTIFICATE OF SUBMISSION AND VIRUS SCAN ........................ 69

CERTIFICATE OF SERVICE................................................................ 70

Appellate Case: 24-2458    Page: 4    Date Filed: 12/02/2024 Entry ID: 5461769

# TABLE OF AUTHORITIES

**CASES:**

*Boude v. City of Raymore*, 855 F.3d 930 (8th Cir. 2017) ........................ 43

*Brogan v. United States*, 522 U.S. 398 (1998) .................................. 23, 28

*Bryson v. United States*, 396 U.S. 64 (1969) .................................... 24, 25

*Buehrle v. City of O'Fallon*, 695 F.3d 807 (8th Cir. 2012) ..................... 43

*Dennis v. United States*, 384 U.S. 855 (1966) .................................... 28

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ............................. 60

*Doe v. Biden*, No. 2022-1197, 2022 WL 16545125
    (Fed. Cir. Oct. 31, 2022) .................................................. 42

*Fischer v. United States*, 144 S. Ct. 2176 (2024) ................................. 28

*Garland v. Cargill*, 144 S. Ct. 1613 (2024) ....................................... 28

*Kajmowiscz v. Whitaker*, 42 F.4th 138 (3d Cir. 2022) ........................... 26

*Loper Bright Enters. v. Raimando*, 144 S. Ct. 2244 (2024) ................... 28

*New York Pistol and Rifle Association v. Bruen*, 597 U.S. 1 (2022) ....... 58

*State v. Hodges*, No. 17-0712, 2018 WL 1433833
    (Iowa Ct. App.Mar. 21, 2018) ............................................ 48

*United States v. Arcadipane*, 41 F.3d 1 (1st Cir. 1994) ........................ 24

*United States v. Bah*, 439 F.3d 423 (8th Cir. 2006) .......................... 62, 64

*United States v. Baker*, 438 F.3d 749 (7th Cir. 2006) ........................... 44

iv

*United States v. Bledsoe*, 334 F. App'x 711 (5th Cir. 2009) .................... 26

*United States v. Carn*, No. 213CR00346APGGWF, 2018 WL 1413971
    (D. Nev. Mar. 20, 2018) ................................................... 55

*United States v. Chan*, No. 22-CR-00109-DKW, 2024 WL 4028019
    (D. Haw. Sept. 3, 2024) ................................................... 58

*United States v. Cook*, 782 F.3d 983 (8th Cir. 2015) .............................. 52

*United States v. Deng*, 104 F.4th 1052 (8th Cir. 2024) .................... 52, 53

*United States v. Dick*, 744 F.2d 546 (7th Cir. 1984) .............................. 24

*United States v. Dolphin*, No. 24-2040, 2024 WL 4799546
    (8th Cir. Nov. 15, 2024) ................................................... 59

*United States v. Espinoza*, 684 F.3d 766 (8th Cir. 2012) ........................ 37

*United States v. Fincher*, 538 F.3d 868 (8th Cir. 2008) .................... 57, 58

*United States v. Frausto*, 636 F.3d 992 (8th Cir. 2011) .......................... 38

*United States v. Gonzalez*, 528 F.3d 1207 (9th Cir. 2008) ...................... 44

*United States v. Harra*, 985 F.3d 196 (3d Cir. 2021) ............................. 38

*United States v. Holden*, 70 F.4th 1015 (7th Cir. 2023).................... 25, 26

*United States v. Janis*, 810 F.3d 595 (8th Cir. 2016)........................ 49, 50

*United States v. Kingston*, 971 F.2d 481 (10th Cir. 1992) ...................... 24

*United States v. Knox*, 396 U.S. 77 (1969)............................................. 25

*United States v. Lovelace*, 565 F.3d 1080 (8th Cir. 2009) ...................... 59

*United States v. Neuner*, 535 F. App'x 373 (5th Cir. 2013).............. 30, 42

Appellate Case: 24-2458    Page: 6    Date Filed: 12/02/2024    Entry ID: 5461769

*United States v. Parker*, 364 F.3d 934 (8th Cir. 2004)......................38, 41

*United States v. Rahimi*, 144 S. Ct. 1889 (2024)....................................59

*United States v. Robertson*, 324 F.3d 1028 (8th Cir. 2003)...............23, 27

*United States v. Salther*, 955 F.3d 666 (8th Cir. 2020)..........................23

*United States v. Sitladeen*, 64 F.4th 978 (8th Cir. 2023).......................57

*United States v. Stimac*, 40 F.4th 876 (8th Cir. 2022)...........................61

*United States v. Subieto-Baun*, No. 92-50331, 1993 WL 24118
    (9th Cir. Feb. 3, 1993) ........................................................................45

*United States v. Theunick*, 651 F.3d 578 (6th Cir. 2011)..................55, 56

*United States v. Vest*, 448 F. Supp. 2d 1002 (S.D. Ill. 2006).......53, 54, 55

*United States v. Warner*, 5 F.3d 1378 (10th Cir. 1993)....................30, 42

*United States v. Wilkins*, 25 F.4th 596 (8th Cir. 2022)..........................21

*Worth v. Jacobson*, 108 F.4th 677 (8th Cir. 2024).................................60

## STATUTES:

18 U.S.C. § 922(a)(6)................................................................................63

18 U.S.C. § 922(o)(1)................................................................................30

18 U.S.C. § 922(o)(2)(A) ...............................................................30, 35, 42

18 U.S.C. § 925(a)(1)................................................................................44

26 U.S.C. § 5812........................................................................................26, 30

Appellate Case: 24-2458    Page: 7    Date Filed: 12/02/2024 Entry ID: 5461769

26 U.S.C. § 5844.............................................................................. 26

26 U.S.C. § 5844(1) ........................................................................ 31

Iowa Code § 362.2(15) (2021) ......................................................... 43

Iowa Code § 726.6 (2021)............................................................... 47

**OTHER AUTHORITIES:**

26 C.F.R. § 479.105(c)................................................................ 31, 32

27 C.F.R. § 479.105(d) .................................................................... 35

132 Cong. Rec. S5358-04, 1986 WL 774609 (1986) ................................ 46

https://www.atf.gov/firearms/docs/guide/atf-national-firearms-act-
handbook-atf-p-53208/download (last visited 11/13/2024) ..................... 32

USSG App.A, Statutory Index ................................................... 63

USSG §2B1.1(c)(3) ........................................................................ 62

USSG §2B1.1, comment. (n.17)....................................................... 62

USSG §3D1.2 ................................................................................ 63

Appellate Case: 24-2458    Page: 8    Date Filed: 12/02/2024 Entry ID: 5461769

# STATEMENT OF THE ISSUES

I.  **Whether the jury instructions fairly and adequately informed jurors about the materiality of the defendant's false statements.**
    1. *Bryson v. United States*, 396 U.S. 64 (1969)
    2. *United States v. Arcadipane*, 41 F.3d 1 (1st Cir. 1994)

II. **Whether the defendant failed to prove that the law-enforcement exception was unconstitutionally vague as applied to his commercial use of city-registered machineguns.**
    1. *United States v. Theunick*, 651 F.3d 578 (6th Cir. 2011)

III. **Whether machineguns remain dangerous and unusual weapons excluded from protection under the Second Amendment.**
    1. *United States v. Fincher*, 538 F.3d 868 (8th Cir. 2008)
    2. *District of Columbia v. Heller*, 554 U.S. 570 (2008)

IV. **Whether the district court correctly applied a sentencing cross reference for the false-statement convictions when they were more aptly punished under the firearm guideline.**
    1. *United States v. Bah*, 439 F.3d 423 (8th Cir. 2006)

# STATEMENT OF THE CASE

Wendt knew that "[m]achine guns are worth bank money." (R.Doc. 349-4, p. 1 (GX 401).) After becoming police chief in the small town of Adair, Iowa, he wrote "law letters" requesting demonstrations or purchases of ninety machineguns in a four-year period. (Trial Tr. Vol. II, pp. 341-42; R.Doc. 349-114 (GX 701).) He personally profited tens of

1

thousands of dollars before his arrest. (Trial Tr. Vol. III, pp. 623-24; R.Doc. 349-116 (GX 703).)

**Wendt became police chief, which allowed him to write "law letters" for machineguns.**

In July 2018, Wendt became chief of police for Adair, a town of less than 800 residents and just one full-time officer. (Trial Tr. Vol. II, p. 332.) In addition to his police job, Wendt owned two gun stores known as BW Outfitters. (*Id.* at 332-33.)

Wendt bragged that "[t]his police chief [g]ig is awesome" because it allowed him to "[s]end machine guns to my own gun store lol." (R.Doc. 349-6, p. 1 (GX 402).) He planned to "build up [a] bunch [of] machine guns" that he could resell when he retired. (R.Doc. 349-4, p. 1 (GX 401).) He implemented this plan just seventeen days after becoming chief by writing his first "law letter." (Trial Tr. Vol. III, p. 618.)

Federal law generally prohibits transfers of post-1986 machineguns, with two relevant exceptions. (Trial Tr. Vol. I, pp. 223, 229.) First, governmental agencies can obtain machineguns for their "official use." (*Id.* at 229-30.) Second, qualified dealers can get

2

machineguns as sales samples to demonstrate for the "possible future purchase" of a governmental agency for its official use. (*Id.* at 230.)

ATF's National Firearms Act (NFA) branch reviews applications to transfer machineguns. (*Id.* at 232.) For a dealer demonstration, a law enforcement agency must write a law letter expressing interest in a particular machinegun for future purchase and official use. (*Id.* at 239.) When reviewing such a letter, ATF examiners look "specifically for the request to see this demonstrated for possible future purchase and official use." (*Id.* at 240.) Examiners rely on those statements and expect them to be true. (*Id.* at 242.) If the letter omitted a statement about possible future purchase or stated a different purpose such as familiarization, ATF "would disapprove" the transfer. (*Id.* at 243.)

In a parallel process, ATF's imports branch reviews requests to import machineguns manufactured overseas. (Trial Tr. Vol. II, p. 303.) The governmental agency purchasing foreign machineguns can submit a purchase order or law letter informing ATF that the machinegun is being imported for its official use. (*Id.* at 310-11.) Examiners look for such an assertion because the statutory exception for importing machineguns requires they be for the governmental agency's official use. (*Id.* at 311-

3

12.) ATF "would disapprove" the importation of a machinegun that was not being obtained for the official use of the purchasing agency. (*Id.* at 313-14.)

After a machinegun is transferred to a governmental agency, it remains restricted and can only be transferred at the request of a governmental agency. (Trial Tr. Vol. I, pp. 235-36.) For dealer sales samples, the dealer may retain the machinegun in its inventory after the demonstration, but it generally cannot resell it without a law letter. (*Id.* at 244-45.) However, when the dealer goes out of business, it may liquidate its inventory by selling to any qualified importer or manufacturer without obtaining a law letter. (*Id.*)

**Wendt helped his friends buy and sell machineguns.**

Some of Wendt's earliest dealings were with Jonathan Marcum, a gun dealer in Indiana. (Trial Tr. Vol. III, pp. 621-22.) They became acquainted over GunBroker, a website that "is kind of like an eBay for firearms." (Trial Tr. Vol. II, p. 366.) After their first successful transaction, Wendt and Marcum discussed writing law letters so Marcum could build up his machinegun inventory, and in exchange Marcum would give 10% of the profits back to Wendt's department. (*Id.* at 369-

4

72.) "I'm sure it will benefit us both," Wendt said in a message at the time. (*Id.* at 371.)

In late 2018 and early 2019, Wendt wrote Marcum three law letters for a total of twenty-three machineguns. (R.Doc. 348-63, 348-67, 348-71 (GX 204, 208, 212).) Each letter requested demonstrations for "possible purchase" and referred to the police department's "official duties." (*Id.*) But to Marcum, Wendt "didn't say specifically one way or the other" whether the department intended to purchase the machineguns; instead, the purpose was for Marcum to resell the machineguns and share the profits. (Trial Tr. Vol. II, pp. 373-77, 381-82.)

The ATF initially denied one of the transfers to Marcum, in part because the law letter suggested the demonstration was for "officer familiarization" rather than possible purchase. (*Id.* at 378-79.) Wendt sent the ATF an email challenging the denial, and he specifically questioned how "the examiner does not like that we have an intent to possibly purchase and an intent to familiarize ourselves with a weapon." (Trial Tr. Vol. III, pp. 689-91.) As Marcum explained, their law letters had to include the "possible purchase" language so ATF would approve the transfers. (Trial Tr. Vol. II, pp. 382-83.)

5

In addition to Marcum, Wendt wrote law letters so his close friend Rob Williams could get machineguns. (*Id.* at 346-47.) Between September 2020 and August 2021, Williams obtained ten machineguns from Wendt's letters, purportedly for the police department to determine if they were suitable for future purchase. (*Id.* at 347-48, Vol. III, pp. 645-46.)

The process with Williams went backwards—for example, he won a machinegun in an auction on GunBroker and then asked Wendt to write a law letter requesting a demonstration of that gun. (Trial Tr. Vol. III, pp. 646-47.) Wendt wrote a letter saying the demonstration was to determine if that machinegun was "suitable for future purpose" and "official use" of the police department. (R.Doc. 348-106 (GX 247).) Based on Wendt's letter, Williams secured the transfer of the AK-47 style machinegun he had won in the online auction. (Trial Tr. Vol. III, p. 648; R.Doc. 348-55 (GX 128A).)

On a different occasion, Williams emailed Wendt seeking a law letter for a PPSH-41 machinegun. (Trial Tr. Vol. III, pp. 648-49.) Wendt responded, "you have so many going on I don't know which is which now." (*Id.* at 649.) Wendt wrote a law letter including "future purchase" and "official use" language, adding that the wooden-stock World War II-era

6

Soviet machinegun was "ideal" for the department. (*Id.* at 649-50; R.Doc. 348-98, 348-53 (GX 239, 127A).)

Wendt wrote law letters for another close friend named Ray Ohl. (Trial Tr. Vol. II, p. 643.) The two had worked together in the past as police officers, and Ohl also worked in Wendt's gun store. (Trial Tr. Vol. IV, pp. 805-06.) Ohl had previously purchased three machineguns that were registered to his police department, but he needed to sell them when his position was eliminated. (*Id.* at 806-10.) He enlisted Wendt to post them on GunBroker. (*Id.* at 810.)

The GunBroker posting caught the attention of Clark Orthwein, owner of Objectiv Solutions in Florida. (Trial Tr. Vol. II, pp. 465-66.) He emailed Wendt to ask whether he needed a law letter, and Wendt responded that he was police chief and could write one. (*Id.* at 467-68.) Orthwein initially agreed to purchase an MP7A1 for $25,000, a significant markup from Ohl's original purchase price of $1,750. (*Id.* at 468-69; Vol. III, p. 644.) He later agreed to add Ohl's HK 416 and HK G36 to the purchase for a grand total of $40,000. (Trial Tr. Vol. II, pp. 469-70.) Wendt wrote law letters to Objectiv Solutions requesting demonstrations to determine if the three machineguns were "suitable for future

7

purchase" and "official use" of the Adair Police Department. (R.Doc. 348-101, p. 4; 348-102, p. 5; 348-103, p. 4 (GX 242, 243, 244).) Even though the department already had an HK 416 in its inventory, the demonstration letters allowed Ohl to transfer the machineguns to Objectiv and profit more than $30,000. (Trial Tr. Vol. II, p. 470; Vol. III, pp. 644-45; Vol. IV, p. 814.)

**Wendt obtained machineguns for himself.**

In addition to helping friends get machineguns, Wendt wrote demonstration law letters for his own gun store, BW Outfitters. (R.Doc. 349-115 (GX 702).) His technique involved writing letters *from himself* as police chief *to himself* as owner of BW Outfitters. (Trial Tr. Vol. II, p. 360.) Early on, he joked to a friend about purchasing an MP5SD: "bought thru PD checked it out wasn't what PD wanted so brad keeps it at bw [Outfitters]." (R.Doc. 349-4, p. 1 (GX 401).)

In July 2018, Wendt ordered an M-249 Para belt-fed machinegun, purportedly for "future possible purchase" by the Adair Police Department. (Trial Tr. Vol. III, p. 637; R.Doc. 348-15 (GX 108A).) He later wrote demonstration letters for BW Outfitters to get two more similar

Appellate Case: 24-2458    Page: 16    Date Filed: 12/02/2024 Entry ID: 5461769

belt-fed machineguns—the MK 46 and MK 48. (R.Doc. 348-25, 348-27 (GX 113A, 114A, 220).)

Dwarfing his other belt-fed machineguns, Wendt wrote a law letter for an M2 "Ma Deuce" machinegun. (Trial Tr. Vol. II, p. 450.) The M2 is a .50-caliber, belt-fed machinegun that is 66 inches long, weighs about 110 pounds, and is generally mounted on tank or armored vehicle. (Trial Tr. Vol. I, pp. 246-47; Vol. III, pp. 592-93; R.Doc. 348-31 (GX 116A).) Wendt's law letter requested a demonstration of the M2 "to further determine if it is suitable for future purchase, and official use by the sworn officers within Adair Police Dept." (R.Doc. 348-84 (GX 225).) His letter described the M2 as "ideal" for the department's "special operations and patrol, based on its price and availability." (*Id.*) The "ideal" price BW Outfitters paid for the M2 was $17,896. (Trial Tr. Vol. II, pp. 450-51.)

When the M2 arrived, Wendt bragged on Facebook, "My ma deuce came in today" and "My belt fed 50bmg came today full auto goin on hummer." (Trial Tr. Vol. III, pp. 655, 657; R.Doc. 349-7 (GX 403).) He later posted photos of the M2 mounted to his personally owned Humvee. (Trial Tr. Vol. III, p. 654; R.Doc. 349-12 (GX 408).) And although Wendt

9

already had the first "Ma Deuce" mounted to his personal vehicle, he later wrote a law letter for a Las Vegas dealer to demonstrate another M2 to the Adair Police Department, again purportedly "for possible future purchase and use of our officers in the performance of their official duties." (Trial Tr. Vol. II, pp. 429-33; R.Doc. 348-94 (GX 235).)

After getting the "Ma Deuce," Wendt contacted a company called Dillon Aero that manufactures the M-134 "minigun." (Trial Tr. Vol. I, pp. 168-69, 172-74.) A minigun is an electrified, Gatling-style machinegun with six rotating barrels capable of firing 3,000 rounds per minute. (*Id.* at 169-70; R.Doc. 349-68 (GX 556).) It weighs 70 pounds plus 300 pounds of ammunition, costs $70,000, and is typically sold to military special forces for mounting on a boat or aircraft. (Trial Tr. Vol. I, pp. 170-72.) Firing a minigun "rattles the teeth right out of your head." (*Id.* at 172.) Dillon Aero declined to send Wendt a price quote because it was "highly improbable" ATF would approve the transfer of a minigun to a small-town police force. (*Id.* at 174-77.)

Following Dillon Aero's rejection, Wendt sought advice from an acquaintance who had a minigun. (Trial Tr. Vol. III, pp. 659-60.) They discussed whether ATF would approve a demonstration letter for a

minigun, and Wendt commented, "Most examiners don't even know what they're looking at [as] long as it's all done correctly." (*Id.* at 661; R.Doc. 349-8, p. 3 (GX 404).) When Wendt asked how he should word his law letter, his acquaintance said, "I can't think of any legit reasoning . . . that's the tricky part with miniguns." (Trial Tr. Vol. III, pp. 661-62; R.Doc. 349-8, p. 4 (GX 404).) Wendt replied, "No reason for a deuce either lol." (Trial Tr. Vol. III, pp. 662; R.Doc. 349-8, p. 5 (GX 404).)

In January 2021, Wendt emailed DeGroat Tactical, which manufactures the GAU-2b minigun. (Trial Tr. Vol. I, pp. 183-84.) He said he already had a "Ma Deuce" mounted to his Humvee, but he wanted to switch it out for a minigun. (*Id.* at 186-87.) Wendt struck a deal to purchase a minigun for $80,000. (*Id.* at 187-88.)

Wendt's law letter stated the Adair Police Department wanted a demonstration of the GAU-2b "for possible future purchase and use of our Officers in the performance of their official duties." (R.Doc. 348-108 (GX 249).) He further asserted the 3,000-round-per-minute machinegun was "particularly suitable for use as a law enforcement weapon." (*Id.*) But after DeGroat began building the minigun, Wendt repeatedly checked

11

whether it would be ready in time for his annual machinegun shoot. (Trial Tr. Vol. I, pp. 190-94, 197-98.)

**Wendt bought and sold machineguns for personal profit.**

Within months of becoming police chief, Wendt bragged to a friend that machineguns are "bank money," explaining he "[p]aid 4k for mp5sd can sell for 20k." (Trial Tr. Vol. III, p. 622.) Soon he purchased three more MP5SD machineguns. (Trial Tr. Vol. II, pp. 383-84.) When Rob Williams asked, "Figuring out how to get rich yet?," Wendt replied that he had purchased more MP5SDs. (Trial Tr. Vol. III, pp. 630-32.) Before Wendt even received those guns, he solicited help on Facebook to "[f]ind someone wanting my extra mp5sd." (*Id.* at 632.) He said the price was $7,000 and offered, "I'll write demo letter." (*Id.*)

Wendt sold the first MP5SD to a dealer named Scott Harrison in Kansas. (Trial Tr. Vol. II, pp. 459-60.) A law letter was required, so Wendt arranged to get one from his longtime friend Royce Kemmann, who was police chief in the town of Lake View. (*Id.* at 461-62; Vol. IV, pp. 821-22.) Kemmann's letter requested a demonstration "for future purchase, and official use by the sworn officers within Lake View Police Dept," but it mistakenly said the machinegun was "ideal for the use by

12

the *Adair* Police Department." (Trial Tr. Vol. II, p. 462; R.Doc. 348-75, p. 4 (GX 216) (emphasis added).) Harrison never spoke to Kemmann, and Kemmann never contacted Harrison about getting a demonstration after ATF approved the transfer. (Trial Tr. Vol. II, pp. 462-63.)

Wendt sold the second MP5SD to a dealer named Chase Cejka in Sioux City. (Trial Tr. Vol. III, pp. 503-04.) Wendt said he would handle getting a law letter. (*Id.* at 504.) Kemmann signed another law letter to demonstrate the MP5SD, purportedly "for future purchase, and official use" of Lake View officers. (R.Doc. 348-74, p. 4 (GX 215).) But Cejka had never spoken to Kemmann and was never contacted to demonstrate the machinegun to Kemmann after ATF approved the transfer. (Trial Tr. Vol. III, p. 505.) Instead, the only time Kemmann ever shot an MP5SD was with Wendt at BW Outfitters. (Trial Tr. Vol. IV, pp. 828-29.)

In October 2019, Wendt ordered three MP7A2 machineguns. (Trial Tr. Vol. III, p. 626.) His law letter asserted the machineguns "are not being acquired for the purpose of resale or transfer, They will be used to carry out [the department's] official responsibilities and duties." (R.Doc. 348-81, p. 1 (GX 222).) He waited more than a year to receive the

13

MP7A2s, but within months he started selling them. (Trial Tr. Vol. III, pp. 626-27.)

Wendt listed the MP7A2s on GunBroker, which attracted the attention of a Florida gun dealer named Colin Johnson. (Trial Tr. Vol. II, pp. 434-35.) Wendt purchased the MP7s for $2,080 each, but he sold them to Johnson for $25,000 each, netting $45,840 in profits. (Trial Tr. Vol. III, p. 627.) Johnson was willing to pay a 1,000% markup because the manufacturer—H&K—will not sell machineguns to anyone outside of law enforcement or the military. (Trial Tr. Vol. II, pp. 435-36.)

Similarly, Wendt's GunBroker posting for a "new in box" MP7 reached Troy McClendon, an Alabama gun dealer. (Trial Tr. Vol. III, pp. 597-99.) McClendon asked whether the transfer would require a law letter, and Wendt replied, "I am Chief of Police, so law letter is NOT a problem." (*Id.* at 600-03; R.Doc. 349-1, p. 1 (GX 302).) Wendt said he was liquidating some guns so he could buy a minigun. (Trial Tr. Vol. II, p. 604.) McClendon agreed to buy the MP7A2 and an MP5SD for a package price of $34,500. (*Id.* at 604-05.) To facilitate the transfers, Wendt wrote law letters requesting demonstrations of the MP7A2 and MP5SD. (R.Doc. 348-73, p. 4 (GX 214); R.Doc. 348-82, p. 11 (GX 223).)

14

Even though the Adair Police Department already possessed those machineguns, Wendt's letters requested demonstrations to determine if they were "suitable for future purchase, and official use by the sworn officers within Adair Police Dept." (*Id.*; Trial Tr. Vol. III, pp. 634-36.) Those transfers, if approved, would have allowed Wendt to secure more than $30,000 in profits from McClendon. (Trial Tr. Vol. III, pp. 636-37.)

On the same day Wendt submitted transfer paperwork for his last MP7A2 to McClendon, he ordered three more MP7A2s, again asserting in the law letter that the machineguns were not for resale and would be used for the department's official duties. (Trial Tr. Vol. III, p. 628; R.Doc. 348-110, p. 1 (GX 251).)

As Wendt contemplated retirement as police chief, he had orders pending for fifteen more machineguns to be registered for the Adair Police Department. (Trial Tr. Vol. III, pp. 624-26.) In total, he spent $150,358 on machineguns, with outstanding orders pushing the grand total to $222,729 for forty-five machineguns. (*Id.* at 345-46; R.Doc. 349-118 (GX 702).) He sold six of those machineguns for a total personal profit of nearly $80,000. (Trial Tr. Vol. III, pp. 623-24; R.Doc. 349-116 (GX 703).)

15

**Wendt took city-registered machineguns to a public machinegun shoot benefiting his gun store**.

Adair's only full-time officer—Sawyer Ocheltree—did not know that the city had machineguns until the summer of 2022 when he found one in the shared patrol vehicle. (Trial Tr. Vol. II, pp. 472, 474-75.) He never received training on machineguns and never viewed any machinegun demonstrations. (*Id.* at 475.) He fired the machinegun only once when, on his own accord, he practiced shooting it. (*Id.* at 475-76.)

Despite never training Officer Ocheltree on the city's machineguns, Wendt advertised at least four city-registered machineguns for a public machinegun shoot. (Trial Tr. Vol. III, pp. 651-52.) That event—co-sponsored by BW Outfitters and Williams Contracting—was held on April 16, 2022, in Woodbine, which is about 75 miles from Adair. (Trial Tr. Vol. II, pp. 349-50; Vol. III, p. 650; R.Doc. 349-11 (GX 407).) In the lead-up to that event, Wendt posted a video of his girlfriend shooting a city-registered MP7 with the caption, "come shoot MP7 😎 April 16." (Trial Tr. Vol. III, pp. 650-51; R.Doc. 349-10 (GX 406).) Similarly, he sent a Facebook message to the "Iowa pew pew" group listing many machineguns that would be available for the public to shoot, including an

16

MP7, M60, HK 416, and HK G36 that were registered to the Adair Police Department. (Trial Tr. Vol. III, pp. 651-52; R.Doc. 349-9 (GX 405).)

Undercover officers attended the April 16 machinegun shoot. (Trial Tr. Vol. III, pp. 507-08, 525.) To shoot the machineguns, members of the public purchased ammunition for $2 to $5 per bullet. (*Id.* at 509, 525.) Among the dozens of available machineguns were a U.S. Ordnance M60 and other machineguns registered to the Adair Police Department. (*Id.* at 511-17, 652-53.) Wendt appeared to be in charge. (*Id.* at 509-10.) At one point, a worker sought Wendt's permission for a patron to shoot the M60, which Wendt granted. (*Id.* at 528-29.) Although there was a "merch" table where people could buy BW Outfitters t-shirts, there was no sign of any law enforcement connection with the machinegun shoot. (*Id.* at 511, 529.) Undercover officers did not see any police uniforms, badges, patrol cars, or police fliers. (*Id.* at 510-11, 529.) In fact, Adair's personnel records showed Wendt was off duty that day. (*Id.* at 534-35.)

At the machinegun shoot, BW Outfitters sold nearly $13,000 worth of ammunition. (Trial Tr. Vol. IV, p. 790.) The proceeds helped cover wages and lunch expenses for BW Outfitters' employees. (*Id.* at 802-03.) The event also had promotional value for BW Outfitters. (*Id.* at 802.) BW

17

Outfitters' manager agreed "there was really no question at all that this was a BW Outfitters event." (*Id.* at 804.)

Adair's mayor at the time, Joanne Byars, did not know about Wendt hosting a machinegun shoot, did not approve using city-registered machineguns at the event, and would have had liability concerns if something went wrong. (Trial Tr. Vol. III, pp. 530-31, 533-34.) In fact, she did not learn that the police department even had machineguns until federal agents executed a search warrant at city hall. (*Id.* at 533.)

**Charges, motions, trial, and sentencing.**

A grand jury charged Wendt with conspiracy to make a false statement and to defraud the ATF, in violation of 18 U.S.C. § 371; eighteen counts of making false statements to the ATF, in violation of 18 U.S.C. § 1001(a)(2); and illegal possession of a machinegun, in violation of 18 U.S.C. § 922(o). (R.Doc. 2.)

Wendt filed a motion to dismiss alleging the charges violated the Second Amendment and were unconstitutionally vague. (R.Doc. 211.) The government resisted. (R.Doc. 223). The district court (Hon. Stephen H. Locher, Judge) denied the motion. (R.Doc. 260.)

18

Before trial, the government dismissed five of the false-statement charges, which resulted in renumbering the remaining counts for trial. (R.Doc. 289.) The jury convicted Wendt of conspiracy to make false statements to the ATF, nine of the thirteen false-statement counts, and illegal possession of a machinegun. (R.Doc. 340.)

Wendt renewed his various complaints in a motion for new trial (R.Doc. 353), and the government resisted (R.Doc. 356). Following a hearing, the district court denied the motion. (R.Doc. 381.)

At sentencing, Wendt objected to applying USSG §2B1.1(c)(3)'s cross-reference for the false-statement convictions. (Sent. Tr. 15-29.) He also objected to enhancements for the number of firearms, abuse of his position of trust, and obstruction, and he thought he deserved a reduction for acceptance of responsibility. (Sent. Tr. 29-48.) The district court overruled his objections and calculated an offense level of 28 with criminal history category I, resulting in an advisory guideline range of 78 to 97 months. (Sent. Tr. 48.) After weighing the § 3553(a) factors, the district court varied downward to a sentence of 60 months' imprisonment and a $50,000 fine. (Sent. Tr. 81-87.)

Wendt appeals.

19

## SUMMARY OF THE ARGUMENT

Wendt lied to get machineguns. His law letters included false assertions that dozens of machineguns were either for the police department's "official use" or for dealer demonstrations for "possible future purchase" by the department. This key language derives from the controlling statutes, regulations, and ATF guidance, so it was capable of influencing whether the ATF would approve his machinegun transfers. And even if the ATF were wrong in its interpretation of the law, Wendt had no right to lie. Supreme Court precedent makes clear that the validity of the government's request for information is not an element of the offense for making materially false statements. The jury instructions fairly and adequately instructed jurors on the materiality and falsity elements, so Wendt does not deserve a new trial.

Next, Wendt received fair notice that he could not possess city-registered machineguns outside of his official duties. He did not exercise the city's authority by allowing members of the public to shoot the city's machineguns with all proceeds benefitting his privately owned gun store. Because § 922(o) clearly proscribed his conduct, his charge was not unconstitutionally vague as applied.

20

Likewise, Wendt had no constitutional right to possess machineguns. The Second Amendment does not apply to dangerous and unusual weapons, and recent Supreme Court cases reaffirm the constitutionality of longstanding machinegun restrictions. As a result, Wendt was not entitled to dismissal of the illegal-possession charge.

Finally, Wendt fails to show any miscalculation of the sentencing guidelines. The conduct set forth in his false-statement convictions supported a cross-reference to §2K2.1's coverage of false statements made to obtain firearms. And Wendt's remaining sentencing challenges lack any merit. This Court should affirm his below-guidelines sentence.

## ARGUMENT

## I. The jury instructions fairly and adequately informed jurors about the materiality of Wendt's false statements.

### A. *Standard of review*

"We review challenges to jury instructions under a deferential abuse of discretion standard and 'will not find error when the jury instruction fairly and adequately submitted the issue to the jury.'" *United States v. Wilkins*, 25 F.4th 596, 600 (8th Cir. 2022) (quotation omitted).

21

### B.    Argument

Wendt lied to get what he wanted. His law letters included key assertions that held the power to influence ATF's approval of machinegun transfers. And his alternative interpretations of the law— right or wrong—did not give him a license to knowingly lie to the ATF. Because Wendt's jury instructions fairly and adequately submitted the issues to the jury, this Court should affirm.

### 1. Wendt's disagreements with ATF regulations did not excuse lying to the ATF.

Wendt's multi-pronged attack misses the context of instruction 24. He argues at length whether the law did or should require affirmations that the machinegun purchases were for "official use" or that the machinegun demonstrations were for "possible future purchase." (Br. 10-34; *see also* R.Doc. 330, pp. 28-29 (instr. 24).) But he was not charged with illegally purchasing or transferring machineguns—he was charged with *lying to the ATF*. And his disagreement with how ATF interpreted or implemented the transfer process did not permit him to circumvent those requirements by lying.

22

All but one of Wendt's convictions centered on making or conspiring to make false statements in violation of 18 U.S.C. § 1001(a)(2). This offense requires proof that "(1) the defendant made a statement; (2) the statement was false, fictitious or fraudulent as the defendant knew; (3) the defendant made the statement knowingly and willfully; (4) the statement was within the jurisdiction of a federal agency; and (5) the statement was material." *United States v. Salther*, 955 F.3d 666, 667 (8th Cir. 2020) (quotation omitted).

"By its terms, 18 U.S.C. § 1001 covers 'any' false statement—that is, a false statement 'of whatever kind.'" *Brogan v. United States*, 522 U.S. 398, 400 (1998) (quotation omitted). The materiality element focuses on whether the false statement "has a natural tendency to influence, or [is] capable of influencing, the decision of the decision making body to which it was addressed." *United States v. Robertson*, 324 F.3d 1028, 1030 (8th Cir. 2003) (quotation omitted). "Materiality does not require proof that the government actually relied on the statement." *Id.* (citation omitted).

The falsity and materiality of Wendt's statements did not depend on whether those statements were required by law. "[T]he government

23

does not need to show that it had some particular extrinsic authority to request the information falsely provided by the defendant." *United States v. Arcadipane*, 41 F.3d 1, 5 (1st Cir. 1994) (collecting cases holding that § 1001 forbids false statements to federal agencies "whether or not legally required"); *see also United States v. Kingston*, 971 F.2d 481, 490 (10th Cir. 1992) ("[T]he existence of a legal requirement that a statement be made is irrelevant for purposes of 18 U.S.C. § 1001."); *United States v. Dick*, 744 F.2d 546, 553 (7th Cir. 1984) ("That a statement was not required to be made to the agency does not make the statement any less material.")

Supreme Court precedent forecloses Wendt's license-to-lie argument. In *Bryson v. United States*, 396 U.S. 64, 65-67 (1969), the defendant had been convicted for falsely denying his affiliation with the Communist Party in an affidavit filed with the NLRB, but later he sought to vacate his § 1001 conviction after the Court invalidated the statute requiring non-Communist affidavits. The Court upheld his conviction, finding the legitimacy of the anti-Communist statute was "legally irrelevant to the validity of petitioner's conviction under § 1001." *Id.* at 68. It explained that nobody "has a privilege to answer fraudulently a

24

question that the Government should not have asked." *Id.* at 72. "Our legal system provides methods for challenging the Government's right to ask questions—lying is not one of them."[1] *Id.*

Applying *Bryson*, courts have recognized that guilt for making false statements to obtain firearms does not depend on the legality of the underlying firearm transfer. The Seventh Circuit has explained, "The power to collect accurate information is of a different character—and stands on a firmer footing—than the power to prohibit particular people from owning guns." *United States v. Holden*, 70 F.4th 1015, 1017 (7th Cir. 2023). In that case, a defendant falsely answered that he was not under indictment for a felony when he purchased a firearm, resulting in a charge for making a materially false statement. *Id.* at 1016. The court rejected his attack on the constitutionality of the underlying firearm prohibition, explaining that "[p]eople cannot engage in self help by telling lies to avoid the inquiry"; instead, "they must tell the truth and seek

---

[1] In a companion case, the Court made clear that "[t]he validity of the Government's demand for information" is not an element of § 1001 and "that one who furnishes false information to the Government in feigned compliance with a statutory requirement cannot defend against prosecution for his fraud by challenging the validity of the requirement itself." *United States v. Knox*, 396 U.S. 77, 79-80 (1969).

25

judicial relief" if they disagree with the prohibition. *Id.* at 1018; *see also United States v. Bledsoe*, 334 F. App'x 711, 711 (5th Cir. 2009) (unpublished) (finding that "even assuming the Government could not constitutionally prohibit Bledsoe from purchasing a firearm," he did not have "'a privilege to answer fraudulently a question that the Government should not have asked.'" (quoting *Bryson*, 396 U.S. at 72)).

In Wendt's case, instruction 24 helped the jury understand how his statements were material to ATF's decision-making process. By statute, machinegun transfers and imports fall under the regulatory authority of the ATF. 26 U.S.C. §§ 5812, 5844; *see also Kajmowiscz v. Whitaker*, 42 F.4th 138, 146 n.2 (3d Cir. 2022). At trial, ATF officials explained that examiners reviewing transfer or import applications specifically looked for "possible future purchase" and "official use" attestations in law letters. (Trial Tr. Vol. I, p. 240; Vol. II, pp. 311-12, 319.) They also made clear that ATF "*would* disapprove" dealer transfers if demonstration law letters omitted "possible future purchase" language and that ATF "*would* disapprove" applications to import machineguns for purposes other than

26

official use.[2] (Trial Tr. Vol. I, p. 243; Vol. II, pp. 313-14, 320 (emphasis added).) And it was more than coincidence that every one of Wendt's 38 law letters included language resembling the "possible future purchase" or "official use" requirements. Thus, instruction 24 properly informed the jury how Wendt's false statements were capable of influencing ATF's decisions to approve machinegun transfers.

Even if ATF's legal interpretations were wrong, Wendt had recourse that did not involve lying. If he believed he was entitled to dealer demonstrations for reasons other than "possible future purchase," or if he wanted to import machineguns for purposes other than "official use," he could have said so in truthful law letters. And if ATF disapproved those truthful transfer or import requests, then he could avail himself of the judicial review process.[3] But he was not entitled to circumvent ATF's review by lying about material facts. Such an argument "loses sight of

---

[2] Wendt selectively quotes this testimony, saying only that law-letter statements "could" impact ATF's review. (Br. 23.) Yet information that "could" affect a decision is still material because it is "capable of influencing" ATF's decision. *Robertson*, 324 F.3d at 1030.

[3] Amici highlight their recent successes invoking judicial review in cases involving bump stocks, pistol braces, and efforts to close the "gun-show loophole." (Amicus Br. 26-27.) None of those cases sanctioned making false statements to the ATF.

27

the distinction between appropriate and inappropriate ways to challenge acts of government." *Dennis v. United States*, 384 U.S. 855, 867 (1966) (holding that although a government function thought to be invalid "is not immune to judicial challenge . . . it may not be circumvented by a course of fraud and falsehood").

Finally, the materiality of Wendt's false statements does not change under the recent Supreme Court cases he cites. (Br. 27-29 (citing *Loper Bright Enters. v. Raimando*, 144 S. Ct. 2244 (2024); *Fischer v. United States*, 144 S. Ct. 2176 (2024); *Garland v. Cargill*, 144 S. Ct. 1613 (2024)).) *Loper Bright*'s limitation of reliance on agency interpretations does not authorize lying to evade those interpretations. *Fischer*'s strict construction of § 1512(c)(2)'s obstruction provision says nothing about § 1001(a)(2), which clearly bars false statements "of whatever kind." *Brogan* 522 U.S. at 400. And *Cargill* shows that instead of lying to the ATF, Wendt should have sought relief by challenging adverse agency action in court.

In sum, Wendt fails to substantiate his "regulation by prosecution" accusation. (Br. i, 10, 33.) He was not charged with illegally purchasing or transferring machineguns, so instruction 24's references to "possible

28

future purchase" and "official use" did not set out the elements of his offenses. Instead, the district court correctly recognized this is "a straightforward false statements case." (R.Doc. 381, p. 29.) Although instruction 24 did not mirror Wendt's preferred interpretation, it fairly instructed jurors how the machinegun-transfer process worked so they could understand how his false statements were capable of influencing ATF's action. As a result, he does not deserve a new trial.

### 2. Instructions 16 and 24 correctly explained that transfers to a government agency are limited to "official use."

Wendt's conviction in count 3 involved his law-letter assertion that three MP7A2 machineguns would be used for "official duties and responsibilities" and "were not being acquired for the purpose of resale or transfer." (R.Doc. 330, p. 18 (instr. 16).) On appeal, he disputes instruction 24's similar explanation that machinegun transfers are restricted to "official use by the law enforcement agency." (Br. 11 (quoting R.Doc. 330, p. 28).) But the district court correctly rejected his attempt to read the "official use" component out of the statutory and regulatory structure.

29

Beginning with the statutory text, applications to transfer machineguns require "a written application," and "[a]pplications shall be denied if the transfer, receipt, or possession of the firearm would place the transferee in violation of law." 26 U.S.C. § 5812. In turn, federal law broadly prohibits "any person to transfer or possess a machinegun." 18 U.S.C. § 922(o)(1). An exception applies for "a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof." *Id.* § 922(o)(2)(A).

The crux of § 922(o)(2)(A) concerns when a transfer is "to or by" or when possession is "by or under the authority of" a political subdivision like the City of Adair. As detailed in subsection 5 (pp. 41-49), this exception did not cover Wendt's actions as a private citizen. Instead, courts recognize the exception applies only to officers acting in their official capacity. *See, e.g.*, *United States v. Warner*, 5 F.3d 1378, 1381 (10th Cir. 1993) ("[Section] 922(o)(2)(A) is properly read to permit only lawful possession of machine guns by federal or state agents *acting in an official capacity*." (emphasis added)); *United States v. Neuner*, 535 F. App'x 373, 374 n.1 (5th Cir. 2013) (unpublished) ("Clear statutory

30

language and Congressional intent limited lawful transfer and possession of machine guns to authorized governmental personnel for use *in their official capacities*." (emphasis added)).

Additionally, Wendt's attempt to purchase imported machineguns provided another statutory hook. The general prohibition of machinegun imports provides an exception for machineguns "being imported or brought in *for the use of* the United States or any department, independent establishment, or agency thereof or any State or possession or any political subdivision thereof." 26 U.S.C. § 5844(1) (emphasis added). Count 3 fell under this provision because the three MP7A2s he sought to purchase were manufactured by H&K in Germany and required an application for importation. (Trial Tr. Vol. II, p. 323; R. Doc 348-110, p. 3 (GX 251).)

Consistent with the statutes, ATF's regulations impose an "official use" requirement. The relevant rule covers the importation and manufacture of machineguns "for sale or distribution to any department or agency of the United States or any State or political subdivision thereof." 26 C.F.R. § 479.105(c). It provides that registration and transfer of those machineguns "shall be conditioned upon and restricted to the

31

sale or distribution of such weapons *for the official use of* Federal, State or local governmental entities." *Id.* (emphasis added).

ATF's guidance to the machinegun industry also supported the "official use" requirement. Wendt does not find the requirement in an open letter issued in 1999 (Br. 21), but he dismisses more recent official guidance. In 2009, the ATF published the National Firearms Act Handbook, which is dubbed the "bible" of ATF's NFA branch and is posted on ATF's public website.[4] (Trial Tr. Vol. II, pp. 297, 301.) It contains a sample law letter for importation and transfer to law enforcement, including the assertion that the machineguns "will be property of our [department] and are not being acquired for the purpose of resale or transfer, and they will be used to carry out its official responsibilities and duties." (R.Doc. 349-123 (GX 807).) This guidance had a direct impact on Wendt's law letter for count 3, which repeated the sample letter's phrasing word-for-word. (R.Doc. 348-110, p. 1 (GX 251).) As a result, the 2009 manual shows that affirmations of "official use"

---

[4]      https://www.atf.gov/firearms/docs/guide/atf-national-firearms-act-handbook-atf-p-53208/download (last visited 11/26/2024).

Appellate Case: 24-2458      Page: 40      Date Filed: 12/02/2024 Entry ID: 5461769

were capable of impacting ATF's decision whether to approve an import or transfer.

Wendt exaggerates the scope of the court's instruction on "official use." He proposes that "the jury was invited to conclude that any subsequent use of a machinegun outside the official use of it would effectively render that transaction illegal." (Br. 32.) Not so. The instructions made clear that Wendt had to know the statement was false "when he made the statement." (R.Doc. 330, pp. 18, 22 (instr. 16 & 18).) This "when made" limitation accommodated the possibility that Wendt could change his mind in the future about the police department's need for machineguns. In fact, the jury's split verdicts on the purchase counts suggests it exercised this discernment. Count 2's acquittal shows Wendt got the benefit of the doubt on the first batch of three MP7A2s, but his immediate reorder of three more MP7A2s after selling the first batch showed the second purchase was for his personal enrichment, not official use. (Trial Tr. Vol. III, p. 628.)

The statutes, regulation, and ATF guidance all support the "official use" requirement in instructions 16 and 24. Congress carved out limited exceptions covering machineguns "for the use of" or "by or under the

authority of" a city, not a broad exception for city employees to obtain machineguns for their personal use outside of their official duties. Because the instructions accurately communicated the "official use" limitation, Wendt fails to show legal error warranting a new trial.

### 3. Instructions 17 and 24 correctly explained that transfers to dealers are limited to "possible future purchase" by a government agency.

Wendt's convictions for counts 6, 8-9, 13-16, and 18[5] involved law letters requesting demonstrations of machineguns "for future potential purchase by the Adair Police Department." (R.Doc. 330, pp. 19-20 (instr. 17).) On appeal, he also complains about instruction 24's explanation that a "requested demonstration must be for possible future purchase and not for some other purpose." (Br. 11 (quoting R.Doc. 330, p. 28).) But the district court correctly declined his attempt to expand the limited exception for dealer sales samples.

The machinegun statute accommodates a limited exception for dealer samples. When a dealer obtains a machinegun for the purpose of demonstrating it to a police agency, it does so "under the authority of"

---

[5] This brief uses the original count numbering from the indictment, not the adjusted numbering used at trial. (*See* R.Doc. 289.)

34

that agency. *See* 18 U.S.C. § 922(o)(2)(A). Yet Wendt complains the requirements for a dealer demonstration "are not contained in any statute." (Br. 32.) The district court recognized the irony of this argument—if the statute did not authorize dealer demonstrations, "it would mean every machine gun his business obtained via demonstration law letter was acquired and possessed illegally." (R.Doc. 381, p. 15.)

The ATF follows a regulation governing dealer demonstrations. That rule—titled "Dealer sales samples"—allows transfers to qualified dealers that specify "the expected governmental customers who would require a demonstration of the weapon" along with information on "the availability of the machine gun to fill subsequent orders." 27 C.F.R. § 479.105(d). The dealer must also submit "letters from governmental entities expressing a need for a particular model or interest in seeing a demonstration of a particular weapon." *Id.*

The "possible future purchase" requirement is inherent in the dealer-sample regime. The regulation's references to "sales samples," "expected governmental customers," and "subsequent orders" all indicate demonstrations must be for possible purchase by the government agency. Even though the regulation does not contain exact wording for law

35

letters, ATF did not overstep its bounds by requiring that "sales sample" machineguns be obtained for possible sale to and purchase by the police department.

Once again, Wendt overlooks ATF's guidance on the "possible future purchase" requirement. He relies on a 1999 open letter (Br. 21-22) while breezing past the 2009 NFA Handbook. Its sample law letter includes the agency's assertion that it would like a demonstration "for possible future purchase and use of our officers in the performance of their official duties." (R.Doc. 349-122 (GX 806).) And this sample language was not foreign to Wendt—many of his law letters copied it word-for-word. (R.Doc. 348-72, 348-76, 348-77, 348-78, 348-79, 348-92, 348-93, 348-94 (GX 213, 217, 218, 219, 220, 233, 234, 235).) His repeated use of the sample language shows its capability of influencing ATF's decision to approve machinegun transfers.

Wendt's paraphrasing of the "possible future purchase" language did not alter the materiality of his false statements. He finds a difference between the meaning of a "possible" versus "potential" future purchase. (Br. 12.) Although many of his law letters used the phrase "possible future purchase," he also used the phrase "potential future purchase."

36

(R.Doc. 348-83 (GX 224).) Other letters asserted the requested demonstrations would be "to further determine if [the machinegun] is suitable for future purchase, and official use by the sworn officers within Adair Police Dept." (*E.g.*, R.Doc. 348-84, 348-85, 348-87, 348-106 (GX 225, 226, 228, 247).) And as the ATF official explained, law letters did not have to include the "exact language" from the NFA Handbook, "but those elements need to be expressed in the law letter." (Trial Tr. Vol. II, pp. 300-01.) Wendt's interchangeable use of "possible," "potential," and "suitable for purchase" all falsely asserted a bona fide interest for purchase by the police department.

Instructions 17 and 24 fairly and adequately submitted the materiality issue to the jury. ATF's regulation and guidance handbook support the limitation of dealer sales samples to the possible future purchase of the law enforcement agency. Wendt's quibbles over the exact language do not require reversal. *See United States v. Espinoza*, 684 F.3d 766, 783 (8th Cir. 2012) ("[A] defendant is not entitled to a particularly-worded instruction when the instructions actually given by the trial court adequately and correctly cover the substance of the requested instruction." (quotation omitted)). Because the instructions accurately

37

explained the materiality of Wendt's "possible future purchase" statements, he does not deserve a new trial.

### 4. Wendt was not entitled to a *Harra* instruction.

Wendt's stretched interpretations of his statements did not warrant a special instruction on ambiguity. He claims "'possible' versus 'potential'" created an ambiguity requiring an instruction modeled after *United States v. Harra*, 985 F.3d 196 (3d Cir. 2021) (Br. 34-35.)[6] The district court correctly noted it was not bound by the Third Circuit's *Harra* decision; instead, it applied binding Eighth Circuit precedent. (Trial Tr. Vol. V, pp. 898-99, 902.) That precedent imposes a "burden of negating literally truthful interpretations of statements in a fraud case when the statements (1) are ambiguous and (2) are subject to *reasonable* interpretations." *United States v. Parker*, 364 F.3d 934, 945 (8th Cir.

---

[6] Wendt has abandoned two related arguments. In the district court, he also claimed ambiguity in the statements "official use" and "not being [ac]quired for the purpose of resale or transfer." (Trial Tr. Vol. V, pp. 899-900.) But on appeal, his argument for a *Harra* instruction does not address any supposed ambiguity in those two statements. (*See* Br. 34-35.) As a result, this Court should find those arguments waived. *See, e.g.*, *United States v. Frausto*, 636 F.3d 992, 997 (8th Cir. 2011) (finding a defendant waived error on appeal by not "providing any analysis or development in his briefs") (citation omitted).

38

2004) (emphasis original) (citing *United States v. Anderson*, 579 F.2d 455 (8th Cir. 1978)).

On appeal, Wendt demonstrates neither ambiguity nor a reasonable alternative meaning of the phrase "possible future purchase and use of our Officers in the performance of their official duties." (*E.g.*, R.Doc. 348-108 (GX 249).) Citing dictionary definitions, he argues "'possible' only means having the authority whereas 'potential' means some connection to a sale." (Br. 12, 35.) But it is not reasonable to interpret Wendt's assertions of possible future purchase for official duties to mean only that he had the authority to buy machineguns. His signature as police chief alone communicated the authority to buy machineguns for official use, so the additional "possible future purchase" communicated something more than just the legal possibility that a police department can buy machineguns. In context, the only reasonable interpretation of "possible future purchase" meant that the department had a genuine interest in purchasing the demonstrated machineguns. That reading aligns with Wendt interchangeably using the phrases "possible future purchase," "potential future purchase," and "suitable for future purchase." (*E.g.*, R.Doc. 348-83, 348-84 (GX 224, 225).)

39

Wendt's own testimony showed no ambiguity in his assertions of "possible future purchase." At trial, he testified the phrase meant "that you may or may not purchase this gun based on your demonstration or familiarization with that item . . ." (Trial Tr. Vol. V, pp. 1016-17.) Wendt spent nearly sixty pages of testimony "walk[ing] through the transactions one by one" attempting to give plausible explanations why the two-officer department had interest in purchasing every one of the dozens of machineguns in his demonstration letters. (*Id.* at 1008-65.) Thus, there is no mistaking that the only reasonable interpretation of "possible future purchase" meant the Adair Police Department had a bona fide interest in purchasing the machineguns.

Wendt's claim of innocence did not create ambiguity. He emphasizes his own testimony "that he believed his statements were true when he made them." (Br. 35.) But the district court found this testimony was false, highlighting Wendt's law-letter assertions that the "Ma Deuce" and minigun were suitable for purchase by the police department. (Sent. Tr. 46-47.) Jurors convicted Wendt because they disbelieved his claimed interest in testing various machineguns for the city's purchase,

40

not because of any ambiguity in the meaning of "possible future purchase."

The district court did not abuse its discretion by declining to give a *Harra* instruction. It reasoned that although Wendt insisted his statements were ambiguous, "I'm not hearing alternative interpretations." (Trial Tr. Vol. V, p. 902.) And on appeal, Wendt does not offer any reasonable alternative interpretation of "possible future purchase" that would permit dealers to obtain sales samples when the law enforcement agency has no genuine interest in buying the machineguns. As a result, "the government did not have the burden to negate the stretched interpretations [Wendt] now offers on appeal." *Parker*, 364 F.3d at 945.

### 5. Instruction 29 correctly limited machinegun possession to performance of official duties.

Wendt did not have unlimited authority to possess machineguns. His conviction in count 20 involved his illegal possession of a city-registered M60 at the April 16, 2022 public machinegun shoot. (R.Doc. 330, p. 24 (instr. 20).) He does not dispute his possession of the machinegun; instead, he challenges the instruction on his government-

41

authority affirmative defense that told the jury to "consider whether his possession on the date in question was within the scope of his official duties as an officer of the Adair Police Department." (Br. 12 (quoting R.Doc. 330, p. 35 (instr. 29)).) This limitation correctly stated the law.

Section 922(o) generally prohibits possession of post-1986 machineguns, but it contains an exception for "possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof." 18 U.S.C. § 922(o)(2)(A). Wendt suggests that police officers are "categorically" exempt and may possess machineguns "not just in the course of their duties." (Br. 25.) But his reading exceeds any reasonable interpretation of § 922(o)(2)(A).

Applying the plain meaning of "by or under the authority of" a government agency, courts have no trouble concluding the exemption extends only to government agents acting in their "official capacities." *E.g.*, *Warner*, 5 F.3d at 1381; *Neuner*, 535 F. App'x at 374 n.1; *see also Doe v. Biden*, No. 2022-1197, 2022 WL 16545125, at *4 (Fed. Cir. Oct. 31, 2022) (unpublished) (agreeing "under the authority of" means "for the benefit of" the government entity). This distinction reflects how

42

government agencies operate. Although a city like Adair can only function through the acts of its employees, it does not follow that every act by an employee—particularly an act done in the employee's private capacity—exercises the city's authority. Wendt thinks he "was always Police Chief" (Br. 15), but he was an officer of the city only when "exercising some portion of the power of a city." Iowa Code § 362.2(15) (2021). Thus, his machinegun possession was not "by or under the authority of" the city unless he was acting in his official capacity.

In postures analogous to § 922(o)(2)(A), this Court has distinguished between the official and private capacities of police officers. For example, a police officer does not receive First Amendment protection when speaking "pursuant to [his] official duties" but does receive some protection for speech "outside the scope of employment." *Buehrle v. City of O'Fallon*, 695 F.3d 807, 811-12 (8th Cir. 2012) (citations omitted). Police officers may receive discretionary-function immunity for acts done "during the course of their official duties." *E.g.*, *Boude v. City of Raymore*, 855 F.3d 930, 934 (8th Cir. 2017). Or as the district court noted, liability under 42 U.S.C. § 1983 attaches to the conduct of a public employee "while acting in his official capacity." (R.Doc. 381, pp. 11-12 (quoting *West*

43

*v. Atkins*, 487 U.S. 42, 50 (1988)).) These cases recognize the simple reality that police officers exercise the authority of the city only while performing their official duties.

Amici's unpreserved[7] reliance on § 925(a)(1) fares no better. That provision states certain portions of § 922 do not apply to firearms "imported for, sold or shipped to, or issued for the use of, the United States or any department or agency thereof or any State or any department, agency, or political subdivision thereof." 18 U.S.C. § 925(a)(1). But § 925(a)(1) does not create a categorical exemption for police officers—rather, it applies only to firearms they possess "in connection with their public responsibilities." *United States v. Baker*, 438 F.3d 749, 758 (7th Cir. 2006); *United States v. Gonzalez*, 528 F.3d 1207, 1214 (9th Cir. 2008) (rejecting a Border Patrol agent's argument for a categorical exemption regarding his government-issued sidearm). Thus,

---

[7] Amici recognize that Wendt never cited § 925(a)(1). (Amicus Br. 8 n.2.) Even if it is similar to an argument he did raise, § 925(a)(1) states a separate exception that simply was not part of the controversy presented to or decided by the district court.

Appellate Case: 24-2458     Page: 52     Date Filed: 12/02/2024   Entry ID: 5461769

just like § 922(o)(2)(A), the exception in § 925(a)(1) did not extend to Wendt's private-capacity machinegun possession.[8]

A broad, categorical interpretation is not tethered to § 922(o)(2)(A)'s purpose. Amici suggest Wendt as police chief was "empowered to specify the appropriate use" of the city-registered machineguns. (Amicus Br. 14.) Similarly, Wendt testified at trial that "as the police chief, I have authority to say who can do anything," including allowing his non-officer girlfriend to shoot a city-registered MP7 in a Facebook ad for BW Outfitters' machinegun shoot. (Trial Tr. Vol. III, pp. 650-51, Vol. V, p. 1086.) But the statute's prohibition of all machinegun possession except that "by or under the authority of" a city does not support any congressional intent for police to misappropriate the city's authority by using machineguns for their personal pleasure or profit.

Likewise, the fallback to legislative history is not persuasive. Wendt quotes an exchange between two senators about officers using personal funds to buy machineguns. (Br. 25, 37-38.) But the district court

---

[8] Likewise, § 925(a)(1) did not permit lying to obtain machineguns. *See, e.g.*, *United States v. Subieto-Baun*, No. 92-50331, 1993 WL 24118, at *2 (9th Cir. Feb. 3, 1993) (unpublished).

45

correctly recognized that "[l]egislative history is properly consulted only in light of textual ambiguity." (R.Doc. 330, p. 19 (quoting *Olson v. Fairview Health Servs. of Minn.*, 831 F.3d 1063, 1071 (8th Cir. 2016)).) And even then "it is the official committee reports that provide authoritative expression of legislative intent, not the stray comments by individual legislators on the floors of the House and Senate." (*Id.* at 20 (quoting *In re Walton*, 866 F.2d 981, 983 (8th Cir. 1989)).) Indeed, just a few lines after the portion Wendt quotes, another senator interjected "to emphasize as strongly as I can that colloquy represents the views of two Members of the Senate . . . , but is not intended to reflect the intentions of the sponsors or the opponents or anyone other than those two Senators." 132 Cong. Rec. S5358-04, 1986 WL 774609 (1986). And in any case, those two senators did not purport to authorize private use of machineguns—rather, the stated example of "confront[ing] well-armed drug dealers or organized criminals" (*id.*) envisioned police officers performing their official duties.

Next, state law does not—and cannot—expand the scope of the federal statute's exception.

46

- First, Wendt cites an Iowa statute that permits certain people or entities to possess offensive weapons "when the person's or entity's duties or lawful activities require or permit such possession," Iowa Code § 724.2(1). (Br. 24.) But under the Supremacy Clause, these exceptions to the state's machinegun ban cannot expand the types of machinegun possession authorized by federal law. For example, section 724.2(1)(c) purports to authorize machinegun possession by "[a]ny person in service of the United States," but Wendt cannot credibly argue this state authorization puts every federal employee beyond the reach of § 922(o).

- Second, Wendt cites the Iowa statute allowing peace officers to obtain professional permits to carry weapons, Iowa Code § 724.6. (Br. 25.). But it uses the generic "weapons" rather than specifically authorizing machineguns. Iowa Code § 724.6 (2021). Also, it authorizes professional weapons permits for private investigators, security guards, and bank messengers (*id.*), but Wendt cannot credibly argue the provision allows any of them to possess machineguns contrary to § 922(o).

47

- Third, Wendt concludes the state statutes make it "impossible to say [he] did not have the authority to have the machinegun" at the April 16, 2022 machinegun shoot 75 miles outside of Adair. (Br. 25; Trial Tr. Vol. III, p. 350.) But under Iowa law, "Generally, a governing body like a municipality can directly exercise its police powers only within its jurisdictional boundaries," with limited exceptions for traffic enforcement and offenses arising from traffic stops. *State v. Hodges*, No. 17-0712, 2018 WL 1433833, at *3-4 (Iowa Ct. App. Mar. 21, 2018) (unpublished) (quoting *State v. Snider*, 522 N.W.2d 815, 817 (Iowa 1994)).

Together, state law cannot be read as legalizing a broader swath of machinegun possession than § 922(o)(2)(A).

Finally, the instruction gave Wendt room to defend himself on any factual ambiguity surrounding his machinegun possession. It told the jury that his government-authority defense excused his conduct if "he had the authority, *or reasonably believed* he had the authority, to possess a machine gun." (R.Doc. 330, p. 35 (instr. 29) (emphasis added).) Thus, Wendt had the opportunity to urge the jury to consider circumstances suggesting the April 16, 2022 machinegun shoot in Woodbine constituted

48

part of his official duties for the Adair Police Department. The fact that the jury disbelieved his flimsy defense does not justify applying a strained interpretation of the law-enforcement exception.

In sum, instruction 29 properly limited Wendt's authority to "the scope of his official duties." (R.Doc. 330, p. 35.) As the district court noted, the plain meaning of "authority" encompasses "[t]he official right or permission to act" and "[t]he power a person has through an official position." (R.Doc. 381, p. 12 (quoting Black's Law Dictionary (11th ed. 2019).) Allowing Wendt to possess machineguns outside of his official duties would defy the plain language of § 922(o)(2)(A)'s limited exception. Because the jury received an accurate instruction, Wendt is not entitled to relief.

### 6. Any error was harmless.

Even if Wendt could show an abuse of discretion, "harmless-error analysis applies to issues of instructional error, including where the district court 'misdescrib[es] an element or omit[s] an element altogether.'" *United States v. Janis*, 810 F.3d 595, 598 (8th Cir. 2016) (quotation omitted). "[A]n error in jury instructions 'may be disregarded

49

if it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.'" *Id.*

The evidence left no reasonable doubt about Wendt's guilt for making false statements. He wrote some law letters for personal profit, such as asking an Alabama dealer to demonstrate an MP5SD and MP7A2 the Adair Police Department already possessed in order to sell the machineguns to that dealer (Trial Tr. Vol. III, pp. 634-37), and then immediately ordering three more MP7A2s (*Id.* at 626-28). He wrote other law letters for demonstrations of machineguns that had no place in a small-town department, such as the 110-pound "Ma Deuce" .50-caliber that he mounted to his personal Humvee (*Id.* at 592-93, 654-57), and the 3,000-round-per-minute "minigun" that he wanted for his gun store's machinegun shoot (Trial Tr. Vol. I, pp. 186-98; Vol. III, pp. 661-62). And no demonstration was necessary to determine that other guns would not meet the needs of a modern police department, such as the scratched-and-dented AK-47 with a wooden stock (Trial Tr. Vol. V, pp. 1083-84), the gangster-era "Tommy gun" (*id.* at 1047), or the machinegun from the "A-Team" television show (*Id.* at 1049-50). Giving different instructions would not have made these statements any more true.

50

Next, the evidence left no reasonable doubt about the materiality of Wendt's false statements. He suggests ATF's regulation "expressly prohibits" requiring law-letter assertions like "future possible purchase." (Br. 33.) Even if he were correct—and he is not—the supposedly irrelevant factor was still capable of influencing ATF's decision. The evidence showed that ATF disapproved one of the earliest transfers to Marcum because Wendt's law letter stated the demonstration's purpose was "officer familiarization." (Trial Tr. Vol. II, pp. 378-79; Vol. III, pp. 689-91.) After that, Wendt tailored every one of his subsequent law letters to include "possible future purchase" or equivalent language to ensure ATF would approve the transfers. Thus, Wendt's mistruths held the power to alter ATF's approval decisions, making them materially false statements.

Finally, it bears repeating that Wendt went to trial for lying to the ATF, not for illegally purchasing machineguns. No changes to the instructions would cause a reasonable jury to overlook the knowingly and materially false statements he made. As a result, this Court should decline his request for a new trial.

51

## II. Wendt failed to prove that the law-enforcement exception was unconstitutionally vague as applied to his commercial use of city-registered machineguns.

### A. Standard of review

"We review de novo whether a penal statute . . . is void for vagueness under the Fifth Amendment." *United States v. Cook*, 782 F.3d 983, 987 (8th Cir. 2015) (quotation omitted).

### B. Argument

Wendt received fair notice that his personal and commercial use of city-registered machineguns fell outside § 922(o)(2)(A)'s law-enforcement exception. He did not exercise the city's authority by allowing members of the public to pay to shoot city machineguns at a privately sponsored event. Because Wendt failed to show unconstitutional vagueness as applied to his conduct, this Court should affirm the denial of his motion to dismiss.

Wendt bears the burden prove that § 922(o) is vague under the facts of his case. "A criminal statute is void for vagueness under the Fifth Amendment's Due Process Clause 'if it fails to give ordinary people fair notice of the conduct it punishes or is so standardless that it invites arbitrary enforcement.'" *United States v. Deng*, 104 F.4th 1052, 1054 (8th

52

Cir. 2024) (quotation omitted). But he "must show that the statute 'is vague as applied to his particular conduct.'" *Id*. "That's because a defendant 'who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'" *Id*.

Wendt's vagueness challenge resumes his complaint about the meaning of § 922(o)(2)(A)'s exception for machinegun possession "by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof." As detailed above in section I(B)(5) (pp. 41-49), this exception's plain language supported instructing the jury that it applied only to machinegun possession while exercising the police department's official duties. Reframing the argument as a vagueness challenge does not change the result.

Wendt misplaces reliance on *United States v. Vest*, 448 F. Supp. 2d 1002 (S.D. Ill. 2006). That case involved a state trooper who served as lead rifle instructor and purchased a single machinegun while serving as equipment officer for the SWAT team. *Id*. at 1004. He was charged with violating § 922(o) under the theory that he did not have permission to use

53

state police letterhead to order the weapon. *Id.* The district court found the statute unconstitutionally vague as applied, questioning how a reasonable officer would know when he lacked authority for "his possession of a machine guns as part of his employment." *Id.* at 1008-10. The court further emphasized, "there is no evidence to support the notion that Vest ever possessed or used the machine gun at issue in this case for anything other than law enforcement purposes." *Id.* at 1011-12.

Wendt's case presents a much different scenario than *Vest*. He was not convicted for possessing machineguns while patrolling Adair, for securely storing those machineguns while off duty, or for any other possession that was truly "part of his employment." Rather, he allowed paying members of the public the opportunity to use city-registered machineguns at a machinegun shoot sponsored by his gun store. (Trial Tr. Vol. III, pp. 650-52.) The public paid $2 to $5 per bullet, resulting in about $13,000 in sales for BW Outfitters. (*Id.* at 509, 525; Vol. IV, p. 790.) There was BW Outfitters "merch" for sale, but no sign of any connection to law enforcement. (Trial Tr. Vol. III, pp. 511, 529.) Undercover officers saw no police uniforms, badges, patrol cars, or police fliers. (*Id.* at 510-11, 529.) Wendt's own witness—the manager of his gun

54

store—confirmed "there was really no question at all that this was a BW Outfitters event." (Trial Tr. Vol. IV, p. 804.) And Wendt himself was off duty and 75 miles outside his jurisdiction. (Trial Tr. Vol. II, p. 350; Vol. III, pp. 534-35.)

These facts mattered to Wendt's as-applied challenge and distinguished his case from *Vest*. His case did not involve an internal dispute over the misuse of police letterhead or a machinegun that was "never used . . . for anything but law enforcement purposes." *Vest*, 448 F. Supp. 2d at 1004. Instead, Wendt's commercial use of city-registered machineguns for his store-sponsored event does not fit any reasonable reading of § 922(o)'s law-enforcement exception. *See United States v. Carn*, No. 213CR00346APGGWF, 2018 WL 1413971, at *1 (D. Nev. Mar. 20, 2018) (distinguishing *Vest* and finding no vagueness when the defendant "possessed the weapons for commercial or personal purposes, with no connection to law enforcement use").

Wendt's circumstances are closer to *United States v. Theunick*, 651 F.3d 578 (6th Cir. 2011). That case involved a small-town police chief and two county prosecutors who purchased machineguns and other restricted weapons, purportedly for law enforcement use. *Id.* at 583-84. When the

scheme was uncovered, the defendants invoked *Vest* and sought to dismiss their charges for unlawfully receiving, possessing, and transferring the machineguns. *Id.* at 584-85. The Court declined to follow *Vest*, affirming the jury's finding that "the Defendants used the authority of their positions as a pretext for acquiring multiple machine guns for their personal use." *Id.* at 587. Like *Theunick*, Wendt exploiting his police-chief title as pretext to generate revenue for his gun store fell well outside Congress's intent to excuse machinegun possession only "by or under the authority of" the city.

In the end, police officers like Wendt do not have "inherent authority" (Br. 39) to possess machineguns at all times and for any purpose. Section 922(o)(2)(A)'s "under the authority of" exception gives fair notice that it exempts police officers only when they exercise the city's authority through the performance of their official duties. And there is nothing arbitrary about enforcing § 922(o)'s broad machinegun ban against police officers acting outside of their official duties. The district court properly denied Wendt's motion to dismiss, so this Court should affirm.

56

### III. Machineguns remain dangerous and unusual weapons excluded from protection under the Second Amendment.

#### A. *Standard of review*

Second Amendment challenges are reviewed de novo. *United States v. Sitladeen*, 64 F.4th 978, 983 (8th Cir. 2023) (citation omitted).

#### B. *Argument*

Wendt had no constitutional right to possess machineguns. The Second Amendment does not apply to dangerous and unusual weapons. And recent Supreme Court decisions reaffirm the longstanding restriction of weapons not in common use among the people. As a result, this Court should affirm the denial of Wendt's motion to dismiss.

The district court properly applied this Court's holding in *United States v. Fincher*, 538 F.3d 868 (8th Cir. 2008). (R.Doc. 260, pp. 5-6.) *Fincher* rejected a constitutional attack on § 922(o), explaining, "Machine guns are not in common use by law-abiding citizens for lawful purposes and therefore fall within the category of dangerous and unusual weapons that the government can prohibit for individual use." *Id.* at 874. In doing so, the Court relied on *Heller*'s instruction that the limitation of weapons like short-barreled shotguns "is fairly supported by the historical

57

tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* at 873-74 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 624-25 (2008)).

*Fincher* withstands *New York Pistol and Rifle Association v. Bruen*, 597 U.S. 1 (2022). In that case, the Supreme Court jettisoned the "means-end" test that some courts adopted after *Heller*, and it refocused the analysis on "the Second Amendment's plain text" and "this Nation's historical tradition of firearm regulation." *Id.* at 17. But as the district court recognized, *Bruen* did not affect *Fincher*, which was "one of many Eighth Circuit cases that essentially foreshadowed *Bruen* by focusing on the text of the Second Amendment and Founding-era firearm regulations, rather than engaging in means-end scrutiny." (R.Doc. 260, p. 7.) *Bruen* also repeated *Heller*'s recognition of "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Bruen*, 597 U.S. at 21 (quoting *Heller*, 554 U.S. at 627). And after *Bruen*, an overwhelming majority of courts have ruled that "machineguns remain 'dangerous and unusual weapons' that are not entitled to the protections of the Second Amendment." *United States v. Chan*, No. 22-CR-00109-

58

DKW, 2024 WL 4028019, at *6 & n.16 (D. Haw. Sept. 3, 2024) (collecting cases).

Next, Wendt shows no clear or obvious error in his unpreserved invocation of *United States v. Rahimi*, 144 S. Ct. 1889 (2024). The district court's Second Amendment ruling predated *Rahimi*'s June 21, 2024 decision. (R.Doc. 260 (filed Aug. 17, 2023).) And although Wendt filed an "emergency motion" invoking three other end-of-June Supreme Court decisions, *Rahimi* was not one of them. (R.Doc. 393.) Because Wendt did not preserve his *Rahimi* argument, he cannot secure relief without showing plain error, meaning an error "that is clear or obvious under current law." *United States v. Lovelace*, 565 F.3d 1080, 1092 (8th Cir. 2009) (citations omitted)). *Rahimi* upheld the constitutionality of § 922(g)(8)'s disarmament of an individual subject to a domestic violence restraining order—it did not clearly or obviously recognize any Second Amendment right to possess machineguns. *See Rahimi*, 144 S. Ct. at 1894. As a result, the district court had no sua sponte duty to dismiss Wendt's § 922(o) charge. *See United States v. Dolphin*, No. 24-2040, 2024 WL 4799546, at *1 (8th Cir. Nov. 15, 2024) (in a post-*Rahimi* decision, finding "no plain error with respect to the Second Amendment" and citing

59

*Fincher*'s holding that the defendant's possession of machineguns was unprotected).

Finally, it does not matter that "Wendt was a police officer." (Br. 42.) Any suggestion that the Second Amendment grants higher protection to police officers violates the "strong presumption" that the right to bear arms "belongs to all Americans." *Heller*, 554 U.S. at 581. This Court recognizes the right of "the people" enshrined in the Second Amendment "unambiguously refers to all members of the political community, not an unspecified subset." *Worth v. Jacobson*, 108 F.4th 677, 689 (8th Cir. 2024) (recognizing the right of 18- to 20-year-olds to obtain permits to carry weapons (quoting *Heller*, 554 U.S. at 580)). Simply put, police officers do not have extra Second Amendment rights to possess machineguns outside their official duties.

The district court correctly denied Wendt's motion to dismiss. Machineguns are "dangerous and unusual weapons" that receive no Second Amendment protection, and the Supreme Court's recent cases show no sign of budging from the commonsense limitation. Rather, it would be "startling" to read its precedent to mean that "restrictions on machineguns . . . might be unconstitutional." *Heller*, 554 U.S. at 624.

This Court should affirm.

## IV. The district court correctly applied a sentencing cross reference for the false-statement convictions because they were more aptly punished under the firearm guideline.

### A. Standard of review

"When considering whether there is procedural error, we review the district court's factual findings for clear error and its application or interpretation of the Guidelines de novo." *United States v. Stimac*, 40 F.4th 876, 880 (8th Cir. 2022) (quotation omitted).

### B. Argument

The district court properly applied the §2B1.1(c)(3) cross reference. The conduct set forth in Wendt's count of conviction deceived not only the ATF, but also some of the importers, manufacturers, and dealers involved in the machinegun transactions. As a result, his false-statement convictions were properly grouped with his conviction for illegal possession of a machinegun. Finally, Wendt shows no clear error in the application of various sentencing enhancements.

For Wendt's false-statement convictions, the district court applied the cross reference in USSG §2B1.1(c)(3). (Sent Tr. 24-28.) That cross reference applies when three conditions are met:

61

> If (A) neither paragraph (1) nor (2) of this subsection applies; (B) the defendant was convicted under a statute proscribing false, fictitious, or fraudulent statements or representations generally (e.g., 18 U.S.C. § 1001, § 1341, § 1342, or § 1343); and (C) the conduct set forth in the count of conviction establishes an offense specifically covered by another guideline in Chapter Two (Offense Conduct), apply that other guideline.

USSG §2B1.1(c)(3). Wendt does not dispute the first two conditions. And under the third condition, the "conduct set forth in the count of conviction" applies when "the conduct alleged in the count of the indictment of which the defendant is convicted establishes the elements of another offense." *United States v. Bah*, 439 F.3d 423, 427 (8th Cir. 2006) (quoting *United States v. Genao*, 343 F.3d 578, 583 (2d Cir. 2003)). This cross reference accommodates cases in which a defendant is convicted of a general fraud statute but his conduct "is more aptly covered by another guideline." USSG §2B1.1, comment. (n.17).

Wendt's conduct was "more aptly covered" by the guidelines applicable to making false statements to obtain firearms. It is a crime to "knowingly make any false or fictitious oral or written statement" that is "intended or likely to deceive" a licensed importer, manufacturer, or dealer "with respect to any fact material to the lawfulness of the sale or

other disposition of such firearm." 18 U.S.C. § 922(a)(6). Violations of § 922(a)(6) are punishable under §2K2.1. USSG App.A, Statutory Index. And §2K2.1(a)(5)'s higher base offense level for offenses that involved machineguns provides more appropriate punishment for Wendt's conduct, which endangered the public by adding more machineguns into circulation. For instance, one of the MP7s he resold to Colin Johnson was later stolen from Johnson's car (R.Doc. 388-7 (Gov't Sent. Ex. 8)), putting an unusually dangerous weapon in criminal hands.

Wendt's conduct supported the district court's application of the cross reference. The indictment accused Wendt of submitting false law letters to other "FFL-SOTs" to obtain machineguns. (*E.g.*, R.Doc. 2, p. 2.) The district court found counts 1, 3, 6, 8, 9, 13, and 18[9] intended to deceive the dealers and importers about the lawfulness of the machinegun transfers. (Sent. Tr. 25-28.) Indeed, several dealers or importers withdrew pending orders when they learned of Wendt's false-

---

[9] These counts involved dealers and importers other than BW Outfitters. As the government noted, Wendt's false statements could not deceive himself. (R.Doc. 387, pp. 8-9 n.3.) However, because the counts involving law letters addressed to BW Outfitters "involve[d] substantially the same harm," they were properly grouped with the other false-statement counts. USSG §3D1.2.

63

statement scheme. (Trial Tr. Vol. II, pp. 342, 444-46; Vol. V, pp. 1102-06; *see also* Sent. Tr. 26-27 (highlighting some "really straightforward example[s]").) Thus, the district court did not clearly err by finding Wendt's conduct established violations of § 922(a)(6), which are covered under §2K2.1.

Wendt's interpretation defies §2B1.1(c)(3)'s plain language and inappropriately narrows the cross reference. He cites cases defining "offense of conviction." (Br. 44-45.) But §2B1.1(c)(3) uses the broader term "conduct set forth in the count of conviction," which this Court has interpreted to cover "the conduct alleged in the count of the indictment." *Bah*, 439 F.3d at 427. As the district court noted, the cross reference must be broader than "offense of conviction"—if it required lining up the jury's verdict against the elements of a separate offense, "I cannot come up with a single scenario where 2B1.1(c)(3) applies." (Sent. Tr. 25.) By their very nature, cross references require looking beyond the elements of the count of conviction.

Wendt's remaining complaints do not preclude application of the cross reference. He thinks § 922(a)(6)'s element that the false statement was "intended or likely to deceive" an importer, manufacturer, or dealer

was inconsistent with his acquittal for conspiracy to defraud the ATF. (Br. 45.) But an acquittal for conspiracy—which required an agreement with another person—says nothing about whether Wendt himself intended to defraud anyone. And finding reasonable doubt about defrauding the ATF does not signal how the jury would have found on the intent or likelihood of deceiving an importer, manufacturer, or dealer. Next, Wendt contends his false statements were not made "with respect to any fact material to the lawfulness of the sale or other disposition of such firearm or ammunition under the provisions of this chapter." (Br. 45-46.) But § 922(o)'s machinegun prohibition is a "provision[] of this chapter," and his assertions that the machineguns were for "official use" or demonstrations for possible governmental purchase reassured the importers, manufacturers, and dealers that the transactions complied with § 922(o)(2)(A)'s "by or under the authority of" exception. Because none of Wendt's complaints precluded the §2B1.1(c)(3) cross reference, he fails to demonstrate clear error.

Finally, Wendt's miscellaneous sentencing challenges hold no merit. In a footnote, he summarily asserts that without the cross reference, the group for illegal possession of a machinegun would not get

enhancements for abuse of trust or obstruction and that it would receive a reduction for acceptance of responsibility. (Br. 43 n.7.) But Wendt exploited his title as police chief to obtain and possess machineguns he used to generate revenue for his gun store, which amounted to an abuse of his position of trust under USSG §3B1.3. (Sent. Tr. 43-44.) Next, he testified falsely about the truthfulness of his law letters used to obtain machineguns, which obstructed justice for an offense "closely related" to the illegal-possession conviction as provided in USSG §3C1.1. (Sent. Tr. 46-48.) And he put the government to its burden of proof at a seven-day jury trial, so he did not qualify for an acceptance-of-responsibility reduction under USSG §3E1.1. (Sent. Tr. 48.)

Wendt fails to demonstrate any miscalculation of the guidelines. The district court did not clearly err by applying §2B1.1(c)(3)'s cross reference, and his remaining challenges border on frivolous. Accordingly, this Court should not disturb his sentence.

66

## CONCLUSION

Wendt's convictions and sentence should be affirmed.

Respectfully submitted,

Richard D. Westphal
United States Attorney

By:  */s/ Kyle P. Hanson*
Kyle P. Hanson
Assistant United States Attorney

Neal Smith Federal Building
210 Walnut Street, Suite 455
Des Moines, Iowa 50309
Tel: (515) 473-9300
Fax: (515) 473-9292

67

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

This brief complies with the type-volume limitation of Fed. R. App.P.32(a)(7)(B)(i) because this brief contains 12979 words, excluding the parts of the brief exempted by Fed. R. App.P.32(f).

This brief complies with the typeface requirements of Fed. R. App.P.32(a)(5) and the type style requirements of Fed. R. App.P.32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft 365 Word in Century Schoolbook font, 14 point.

Dated: November 27, 2024.

By: */s/ Kyle P. Hanson*
Kyle P. Hanson
Assistant United States Attorney

Neal Smith Federal Building
210 Walnut Street, Suite 455
Des Moines, Iowa 50309
Tel: (515) 473-9300
Fax: (515) 473-9292

68

# CERTIFICATE OF SUBMISSION AND VIRUS SCAN

I hereby certify that on this 27th day of November 2024, I electronically submitted the BRIEF OF APPELLEE with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system after scanning it for viruses by using the McAfee Endpoint Security scan software program, which reported no viruses were found. Paper copies will be transmitted upon receipt of the Notice of Filing from the Clerk of Court.

*/s/Dawn Thomas*
Paralegal Specialist

Appellate Case: 24-2458     Page: 77     Date Filed: 12/02/2024 Entry ID: 5461769

## CERTIFICATE OF SERVICE

I hereby certify that I did on this _____ day of 2024, mail a true and correct copy of the foregoing BRIEF OF APPELLEE by placing it in the U. S. mail, postage prepaid and addressed to the following:

Nicholas A. Klinefeldt
Attorney at Law
801 Grand Avenue, 33rd Floor
Des Moines, Iowa 50309

_____
Name
Title

Neal Smith Federal Building
210 Walnut Street, Suite 455
Des Moines, Iowa 50309
Tele: (515) 473-9300
Fax:  (515) 473-9292

70